UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NICOLE BLAKE,<br>        *Plaintiff,*<br>        *v.*<br>DEVELOPMENTAL SERVICES,<br>        *Defendant.* | Civil No. 3:15cv1415 (JBA)<br><br>September 29, 2017 |

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Nicole Blake brought this action against her former employer, Defendant State of Connecticut Department of Developmental Services ("DDS"), alleging in Count One that she was subjected to a hostile work environment, suspended, and given a poor evaluation because of her race and color, and in Count Two that she was discharged in retaliation for her having filed discrimination complaints, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, and the Civil Rights Act of 1991. Defendant now moves [Doc. # 54] for summary judgment. Oral argument was held April 7, 2017. For the following reasons, Defendant's Motion is granted.

**I.    Background[1]**

Plaintiff began working for DDS beginning in 1997 at the Lower Fairfield Center, one of Defendant's residential facilities, first as a cook attendant and then a Mental Retardation Worker 1. (Def.'s Local Rule 56(a)1 Statement. ("Def.'s LR 56") [Doc. # 54-2] ¶¶ 3-4; Pl.'s Local Rule 56(a)2 Stmt ("Pl.'s LR 56") [Doc. # 62].) In 2007 Plaintiff applied for and received the position of

---

[1] Defendant's Reply brief reviews Plaintiff's Affidavit [Doc. # 61] to explain how each paragraph is not sufficient to create a material issue of disputed fact because the statements either contradict Plaintiff's deposition or are otherwise "unsupported by admissible evidence that actually refutes" the facts. (Def.'s Reply at 2.) The Court addresses relevant admissibility arguments throughout the Background and Discussion Sections.

Developmental Services Worker 2, and began working at DDS's Hilltop Group Home in Trumbull, CT. (Def.'s LR 56 ¶ 5.) In 2010 the Hilltop Facility closed as part of DDS program closures and conversions to private operation. In April 2010 Plaintiff bid on and received a position at the Ella Grasso Center, a DDS residential care facility housing lower functioning clients requiring a high level of care. Vanessa Alvarez was the program manager at the Ella Grasso Center. (Def.'s LR 56 ¶¶ 6, 8.)

After making her schedule selection, Plaintiff wrote to Ms. Alvarez to request a change of schedule, but Ms. Alvarez did not make any change. (Def.'s LR 56 ¶ 10; Pl.'s LR 56 ¶ 10.)[2] Subsequently, during the course of her employment at the Ella Grasso Center Plaintiff was investigated on three occasions for client neglect and ultimately terminated.[3] (Def.'s LR 56 ¶ 14; Pl.'s LR 56 ¶ 14.)

The first incident occurred on January 4, 2012 in Unit D and was reported by Mary Sheehan (Def.'s LR 56 ¶ 20; Pl.'s LR 56 ¶ 20), a Per Diem Occupational Therapist at the Ella Grasso Center responsible for developing, implementing, and monitoring client safety protocols for residents.

---

[2] Plaintiff testified that she could not remember anyone else who requested a schedule change and that she did not specifically remember any Hispanic employee who was granted a schedule change. (Ex. 1 (Blake's Depo. ("Pl.'s Tr.")) to Def.'s Mot. for Summary Judgment at 51:25-52:16; 56:8-20.) Her affidavit claiming Ms. Alvarez gave the schedule she had requested to an employee of Hispanic descent with less seniority than her is not sufficient to create a dispute of fact because it directly contradicts her deposition testimony (above). *See Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.") (cited with approval in *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014)).

[3] Plaintiff provided direct care to the clients and was required to follow the established protocols to ensure client safety. (Def's LR 56 ¶ 13; Pl.'s LR 56 ¶ 13.)

(Def.'s LR 56 ¶ 12; Pl.'s LR 56 ¶ 12). Ms. Sheehan found a client who was under Plaintiff's care belted to a toilet without supervision from approximately 6:00 A.M. to 7:15 A.M., which Ms. Sheehan believed was a clear violation of client care protocols by Plaintiff and therefore reported the incident to the Office of Protection and Advocacy. (Def.'s LR 56 ¶ 20; Pl.'s LR 56 ¶ 20.)[4]

The incident was investigated by the DDS Investigations Unit and neglect was substantiated. (Def.'s LR 56 ¶ 22; Pl.'s LR 56 ¶ 22.) The pool investigator, Cynthia Stevenson, followed standard practices and procedures in conducting her investigation, including interviewing witnesses, among them Plaintiff, and considered the toileting guidelines and level of support which were in place for the client. (Def.'s LR 56 ¶ 23; Pl.'s LR 56 ¶ 23.)

The neglect allegation was found substantiated because Plaintiff did not follow the client's level of support guidelines—she did not visually see the client until after 7:00 a.m., an hour after her shift started, nor had she properly transferred supervision of the client to another staff member. (Def.'s LR 56 ¶ 26; Pl.'s LR 56 ¶ 26.)[5] Matters of substantiated client neglect are referred to Human Resources for disciplinary action, which first involves a pre-disciplinary Loudermill hearing at

---

[4] The client's toileting guidelines required the supervision of one staff during the entire toileting routine, with five-minute checks on the toilet, with the client seated on an elevated toilet seat and not seat belted. Further, she required 15-minute checks while awake. (*Id.* ¶ 24.) Plaintiff had been in-serviced, which is a training regarding client protocols (Dyer Aff., ¶7), on the client's Toileting Guidelines and Level of Supervision. (*Id.* ¶ 23.)

[5] Plaintiff admits this allegation in part and then notes that "[a]lthough the investigation determined neglect on the part of the Plaintiff it did not substantiate that the Plaintiff was responsible for placing the client on the toilet. (Exhibit A, para. 25)." (Pl.'s LR 56 ¶ 26.) This is not relevant, however, because the violation was failing to perform the required checks every 15 minutes and had nothing to do with whether plaintiff placed the client on the toilet with the seat belt. The plaintiff admits in her Affidavit, Paragraphs 22-26, that she was assigned to the client at 6:15 a.m. and does not deny that she failed to check on the client in person until 7:15 a.m. in violation of the client care protocols. (*Id.* ¶¶20-25).

which the staff member and a union representative are present. (*Id.* ¶¶ 17, 19.) At the Loudermill hearing Plaintiff "admitted to violating the levels of supervision for this consumer. Additionally, [Plaintiff] admitted that [she] did not do a formal transfer of supervision, nor did [she] properly complete the sleep/data sheet for the consumer." (Ex. F (Suspension Letter re: January 2012) to Harnick Aff.) The Regional Director suspended Plaintiff for five days for substantiated neglect.[6] (*See id.*) Following the January 4, 2012 report of client neglect Plaintiff was temporarily reassigned to Unit E pending completion of the investigation, but her shift and duties remained the same.[7] (Def.'s LR 56 ¶ 29; Pl.'s LR 56 ¶ 29.)

The second incident of neglect occurred on June 21, 2012 when Plaintiff and another staff member took three clients on a community outing. (*Id.* ¶ 39.) Plaintiff was responsible for a client who required one-to-one supervision and the other staff member was responsible for two clients who required continuous supervision. (Ex. A to Innamorato Aff. (Investigation Report)).)[8] Plaintiff, dissatisfied with the amount of money issued for the outing, left all three clients in the care and supervision of the one other staff member in the van while she went inside the unit to

---

[6] Defendant asserts that the suspension is standard practice for substantiated cases of client neglect. (Def.'s LR 56 ¶ 34.) Plaintiff claims that this was not standard practice, arguing that the employee who was responsible for that client prior to Plaintiff starting her shift and who put the client on the toilet was not disciplined. (Pl.'s LR 56 ¶ 34.) Plaintiff presents no evidence of the race of the other employee, or that that other employee was also identified and found responsible for neglect such that a suspension would have been warranted.

[7] At the Ella Grasso Center it is standard practice to transfer a staff member under investigation for client neglect to another unit. The staff member retains the same position and job duties in the other unit. The units are all similar as every unit is a residential unit. (*Id.* ¶ 16.)

[8] Although Plaintiff purports to deny this statement in part, her explanation does not in fact deny that she was required to provide continuous supervision of the client she left in the van. (Pl.'s LR ¶ 39.)

complain to Program Supervisor Duane Dyer, who believed her conduct was a clear violation of client supervision and made a report to the Office of Protection and Advocacy.[9] (*Id.*) Plaintiff does not deny that she had just been in-serviced on the day of the incident regarding one of the client's level of supervision and behavior program and had earlier been in-serviced on May 11, 2012 regarding the levels of supervision and behavior programs for the other two clients. She states that she "was working an overtime shift in a unit which was not her regular unit and therefore was not familiar with the client." (Pl.'s LR 56 ¶ 41.)

After the June 21, 2012 report of client neglect, Plaintiff was temporarily prohibited from working overtime in Unit B pending completion of the investigation. (Def.'s LR 56 ¶ 42; Pl.'s LR 56 ¶ 42.) Plaintiff's shift and duties remained the same and she was not prevented from working overtime in any other unit. (*Id.*) The DDS Investigation was conducted by Lead Special Investigator Joe Innamorato, and neglect was again substantiated. (*Id.* ¶ 44-45.) Investigator Innamorato found that Plaintiff left her co-worker in the van with all three residents for a period of approximately five minutes, which violated the levels of support of two of the three residents because two required continuous supervision and one required one-to-one support, which was being provided by the co-worker, thereby leaving the other two clients without continuous supervision. (Innamorato Aff., ¶7 and attached Exhibit A.) Plaintiff admitted she was supposed to be with one of the residents one-to-one and left her co-worker on the van alone with the three residents. (Pl.'s Tr. at 82:6-12.)

---

[9] Plaintiff first spoke with Ms. Alvarez, who told Plaintiff she needed to address the issue with Mr. Dyer. (*See* Ex. I (June 2012 Incident Investigation Report) [Doc. # 54-5] to Harnick Aff. (attached as Ex. 2 to Def.'s Mot. for Summary Judgment).)

On October 5, 2012 Plaintiff filed her initial CHRO Complaint. (Pl.'s Tr. at 25:18-25 and attached Deposition Exhibit 4). The CHRO made a finding of "No Reasonable Cause" and administratively dismissed Plaintiff's case on December 11, 2014. (Pl.'s Tr. at 209:7-210:9 and attached Deposition Exhibit 32).

In the meantime, the Loudermill hearing for the second incident was conducted November 20, 2012, and Human Resources subsequently sent the matter to DDS Central Office for disciplinary action. (Def.'s LR 56 ¶ 52; Pl.'s LR 56 ¶ 52.) On December 24, 2012, Plaintiff received a ten-day suspension for substantiated neglect (*id.* ¶ 57), which was standard progressive discipline (Harnick Aff., ¶35 and attached Exhibit J).

Plaintiff's performance appraisal for the period of September 1, 2011 through August 31, 2012, issued September 20, 2012, was an overall rating of unsatisfactory based in part on the five-day suspension she received during that rating period for client neglect.[10] (Harnick Aff. ¶39 and attached Exhibit L (Performance Appraisal).) Plaintiff has no examples of an employee who was suspended and did not receive an unsatisfactory rating or have it placed on his or her record. (Pl.'s Tr. at 105:10-106:6.)

The third incident of neglect occurred on January 21, 2013. (Def.'s LR 56 ¶ 61; Pl.'s LR 56 ¶ 61.) Ms. Sheehan observed a client with significant mental and physical needs, for whom Plaintiff was responsible, drinking out of a cup while seated in her wheel chair away from a table (Plaintiff states that the table was next to the client) in violation of the client's mealtime guidelines and

---

[10] Plaintiff's Affidavit asserts that Ms. Alvarez changed the Judgment score to "unsatisfactory" and the quality of work from "good" to "fair." (Ex. A to Pl.'s Opp'n (Pl.'s Aff.) ¶ 27.) She cites no evidence in the record showing her basis for this statement, nor does she indicate whether this is standard practice when an individual has been suspended during the appraisal period. (Pl.'s LR 56 ¶ 59.)

protocols. (*Id.* ¶¶ 61-62.) She reported Plaintiff to the Office of Protection and Advocacy. (Sheehan Aff., ¶¶ 9-10.) Plaintiff does not believe that Ms. Sheehan reported neglect in retaliation for her CHRO complaint or because of her race or color. (Pl.'s Tr. at 119:11-120:17.)

Once again, after the January 21, 2013 report of client neglect Plaintiff was temporarily reassigned to Unit E pending completion of the neglect investigation. (Def.'s LR 56 ¶ 65; Pl.'s LR 56 ¶ 65.) Plaintiff claims that at this time Ms. Alvarez told another employee Jose Ayala "to watch her (the Plaintiff)," which was not something done with other employees, but she fails to offer any factual support for this allegation. (*See* Ex. A (Pl.'s Aff.) to Pl.'s Opp'n ¶ 42.)

This third neglect allegation was investigated by the DDS Investigations Unit by pool Investigator Janet Laudati, and for a third time client neglect was substantiated. (*Id.* ¶¶ 68-69.) Plaintiff had been in-serviced on the client's Mealtime Guidelines and Level of Supervision, which required that the client consume chopped food and thin liquids at a table. (Laudati Aff., ¶6 and Exhibit A, Investigation Report attached thereto; Pl.'s Tr. at 130:12-132:12 and Deposition Exhibit 18.) Plaintiff does not believe that Investigator Laudati discriminated against her because of her race or color but specualtes that it is "possible" that Investigator Laudati retaliated against her for filing a CHRO complaint. (Pl.'s Tr. at 125:2-127:22). Investigator Laudati maintains she was unaware during her investigation that Plaintiff had filed a CHRO complaint. (Laudati Aff., ¶ 10.)

Human Resources conducted a third Loudermill hearing on April 15, 2013 and sent the matter to DDS Central Office for disciplinary action. (Harnick Aff., ¶ 43). On May 20, 2013, Plaintiff received a fifteen-day suspension in accordance with progressive discipline. (Harnick Aff.,

¶ 44 and attached Exhibit O.) Ms. Alvarez had no decision making authority in determination of client neglect or in the imposition of the discipline (Harnick Aff., ¶ 47, Pl.'s Tr. at 137:21-138:5).[11]

Plaintiff grieved each of her three suspensions as well as the written warning but raised no claim of discrimination with any of the suspensions. (See Def.'s LR 56 ¶¶ 35, 56, 77, 84.)

In addition to the above discipline, DDS issued Plaintiff a letter of warning on March 20, 2013 because she removed and disclosed confidential client information as part of her CHRO complaint. (Harnick Aff., ¶48 and attached Exhibit Q.) DDS has clear policy and work rules regarding the confidentiality of client records and Plaintiff was on notice of those rules (Harnick Aff., ¶ 49 and Exhibit R attached thereto), as demonstrated by the written counseling she received in August 2012 for inappropriately obtaining client records for a grievance (Pl.'s Tr. at 160:15-21). Also, on February 13, 2013 Program Supervisor Michele Crapo issued Plaintiff a memorandum memorializing the directive to Plaintiff to stop writing question marks instead of her signature on in-service signature sheets.[12] (Def.'s LR 56 ¶ 85; Pl.'s LR 56 ¶ 85.)

Plaintiff's service rating for the period of September 1, 2012 through August 31, 2013, dated September 16, 2013, was an overall rating of unsatisfactory based in part on the ten and fifteen day suspensions she received during that rating period for client neglect. (Harnick Aff., ¶ 53 and attached Exhibit V). State Personnel Regulation 5-240-1a (c) (5) provides that two consecutive

---

[11] Plaintiff avers that Ms. Alvarez was a participant at Loudermill hearing and was copied on discipline reports. (Pl.'s LR 56 ¶ 79.) However, Ms. Alvarez was not the author of the discipline reports and there is no evidence she was involved in their creation. Plaintiff offers no evidence which would suggest Ms. Alvarez was cc'd for any reason other than that she was the Program Manager.

[12] The signature on the in-service indicates that the staff member has reviewed the information and understands her role and responsibility. (Def.'s LR 56 ¶ 85.)

unsatisfactory service ratings is just cause for dismissal. In accordance with the collective

bargaining agreement, at that point Human Resources must conduct a Loudermill hearing, after

which the matter is transferred to Central Office for review and discipline determination. (Harnick

Aff., ¶ 55).

Accordingly, a Loudermill hearing was held on September 16, 2013 and the matter was sent

to Central Office. (Harnick Aff., ¶56 and Exhibit W attached thereto). DDS Central Office then

made the decision to terminate Plaintiff and issued her a letter of dismissal on October 31, 2013

with an effective termination date of November 5, 2013. (Harnick Aff., ¶ 57 and attached Exhibit

X.)[13]

## II.   Discussion[14]

---

[13] Plaintiff received satisfactory performance ratings in 2005, 2003, 2002, 1999, 1998 (Harnick Aff., ¶60 and attached Exhibit Z); fair performance ratings in 2000, 1999 (Harnick Aff., ¶61 and attached Exhibit AA); and an unsatisfactory performance rating in 2001 (Harnick Afff., ¶62 and attached Exhibit BB). She received a letter of reprimand on May 8, 2001, a twenty day suspension on May 7, 2001, a letter of warning on September 24, 2001, a letter of warning on March 27, 2001 and a notification that her working test period was being extended on July 30, 1999. (Harnick Aff., ¶63 and attached Exhibit CC).

[14] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

Title VII prohibits an employer from discriminating "against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff claims discrimination in the form of disparate treatment, hostile work environment, and retaliation.[15]

## A. Retaliation

Title VII's anti-retaliation protections make it unlawful "for an employer to discriminate against any . . . employee[ ] . . . because [that employee] opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). As interpreted by the Supreme Court, that provision makes acts unlawful when they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

"Retaliation claims under Title VII . . . are . . . analyzed under the *McDonnell Douglas* burden-shifting test." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). In setting

---

[15] Plaintiff's Opposition does not substantively address Defendant's Motion for Summary Judgment with respect to her disparate treatment claim, despite including the heading "Sufficient Questions of Material Fact Exist as to Whether the Plaintiff *was Discriminated Against* and as to Whether the Defendant Created a Hostile Work Environment." (Pl.'s Opp'n at 7 (emphasis added).) At oral argument, counsel for Plaintiff acknowledged that the analysis for a disparate treatment claim differs from that of hostile work environment, but never offered any analysis of what evidence supports Plaintiff's prima facie case of discrimination. At most, Plaintiff alleges that with regard to the first incident, the employee who actually placed the patient on the toilet was not disciplined despite not doing a proper transfer, and that with respect to the third incident regarding the client drinking while not seating at a table, that the supervisor, who was Caucasian, was not disciplined. In both instances, Plaintiff fails to name the individuals or explain how they were similarly situated to her. Thus, Plaintiff has not offered sufficient evidence of disparate treatment for a reasonable jury to find in her favor and this claim must be dismissed.

forth the prima facie case, a plaintiff's burden is *de minimis*, and if the plaintiff satisfies this initial

burden, "a presumption of retaliation arises. The defendant must then articulate a legitimate, non-

retaliatory reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164-65 (2d

Cir. 2010). Where the defendant successfully shows a legitimate, non-retaliatory reason, "the

presumption of retaliation dissipates and the employee must show that retaliation was a substantial

reason for the adverse employment action." *Id.* However, the Second Circuit has observed that

under the *McDonnell-Douglass* framework, the prima facie showing for retaliation "tend[s] to

collapse as a practical matter" into analysis of the later requirement that the plaintiff show the

legitimate reason to be mere pretext. *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d

Cir. 2002); *see also Wilson v. Emhart Teknologies LLC*, 566 F. Supp. 2d 120, 125 n.5 (D. Conn. 2008)

(observing that a jury cannot infer discrimination from thin air and that even where a plaintiff

"nominally" meets each of the prima facie requirements, this showing must also be enough to

support inference of retaliation.)

To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in a

protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment

action; and (4) a causal connection between the protected activity and the adverse employment

action." *Hicks*, 593 F.3d at 164.

Although Defendant disputes that certain of the actions were materially adverse, it does

not dispute that Plaintiff can establish the first three prongs of her prima facie case. Instead, DDS

focuses on its argument that "[t]he evidence simply does not show [Plaintiff's October 5, 2012]

CHRO complaint was the reason that she was disciplined for client neglect, issued a written

warning and a memorandum, transferred to another floor during a neglect investigation, rated as

unsatisfactory and ultimately terminated in accordance with the State Personnel Regulations."[16] (Def.'s Mot. for Summary Judgment at 16.) The Court will first address whether there is sufficient evidence for a jury to find that certain disputed actions were in fact adverse, and subsequently will analyze whether reasonable jurors could reasonably conclude that Plaintiff's filing of the CHRO Complaint was causally connected to those adverse employment actions.

### i. *Disputed Adverse Employment Actions*

The Second Circuit has recognized a broader scope of "adverse employment action" than for substantive discrimination claims in the context of retaliation, noting that the central focus of analysis is "whether the employer's actions were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 169 (interior citations and alterations omitted). Where multiple acts are claimed to constitute retaliation, the Second Circuit has instructed district courts to consider the acts both separately and "in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." *Hicks*, 593 F.3d at 165 (internal citations omitted).

Still, Defendant maintains that the temporary floor transfers pending completion of the investigations and the memorandum issued on February 13, 2013 by her Program Supervisor, Michele Crapo, regarding question marks on her in-service sign in sheets, cannot be seen as adverse employment actions for purposes of Plaintiff's retaliation claim. (Def.'s Mot. for Summary Judgment at 20.) The Court agrees.

---

[16] While this statement implies Defendant agrees these are all adverse employment actions, it later disputes that certain of them actually qualify as such. Plaintiff, for her part, does not argue in her Motion, despite some contentions in the record, that the transfers, warning or memorandum were adverse employment actions.

Plaintiff's temporary unit reassignments during the investigation of the third incident is not an adverse action even for purposes of a retaliation claim requiring "a plaintiff [to] show that a reasonable employee would have found the challenged action . . . well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citations omitted). "[A] lateral job transfer that does not affect an employee's salary or title may be the basis for a Title VII retaliation claim only if the reassignment would have been viewed by a reasonable employee as being materially adverse." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 555 (2d Cir. 2010). A temporary transfer made pursuant to a standard procedure with no change in the plaintiff's shifts, duties, title or pay cannot be an adverse action even for purposes of a retaliation claim.

With respect to the Crapo memorandum, Defendant argues that because there were no resulting consequences it cannot be considered an adverse action. Several district courts in this circuit have found that "reprimands [and] threats of disciplinary action . . . do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429–30 (S.D.N.Y. 2006) (quoting *Honey v. County of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y.2002)); *see also Weeks v. N.Y. State*, 273 F.3d 76, 86 (2d Cir. 2001) *abrogated on other grounds by Nat'l R.R. Passenger Corp., v. Morgan,* 536 U.S. 101 (2002) ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action").

The Crapo memorandum was sent as "notification that [Plaintiff had] been directed to cease adding symbols and/or commentary to in-Service Signature Sheets effective immediately." (Ex. U [Doc. # 54-5] to Harnick Aff. (attached as Ex. 2 to Def.'s Mot. for Summary Judgment).)

There is no evidence connecting it to Plaintiff's termination in any way nor is there any evidence of any negative results. The Crapo memorandum was not even mentioned in the second unsatisfactory evaluation, which references the two suspensions received during the rating period and the March 2013 written warning. (*See* Ex. V to *id.*). Accordingly, even taken in consideration with the other alleged incidents, the Crapo memorandum was not an adverse employment action.

  ii. ***Causation***

  The Supreme Court has clarified that the protected activity must be a "but for" cause of the alleged adverse action by the employer; it is no longer sufficient for plaintiff to show merely that the adverse employment action was a substantial or motivating factor for the alleged retaliation. *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2534 (2013). "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845–46 (2d Cir. 2013) (citing *Univ. of Nassar*, 133 S. Ct. at 2533).

  A plaintiff can prove a causal connection between protected activity and adverse employment action "either: (1) indirectly, by showing that the protected activity was followed closely by retaliatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks*, 593 F.3d at 170.

  Here, Plaintiff's protected activity was the filing of her initial CHRO complaint on October 5, 2012 and therefore only actions taken after that date are considered. Thus, the five-day suspension for the January 2012 incident issued before Plaintiff filed her CHRO complaint has no relevance to the retaliation claim. As to the second incident from June 2012, it had already been

reported, investigated, and found substantiated prior to her filing the October 2012 CHRO complaint.

Plaintiff contends that the close proximity (about a month after she filed her Complaint) of the Loudermill hearing relating to the June 2012 incident (where Defendant imposed a ten-day suspension) to her protected activity is sufficient evidence for a jury to find causation. (Pl.'s Opp'n at 25 (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013) ("[P]resentation of a temporal connection" can be "enough, in and of itself . . . to permit a reasonable jury to find causation."))). But where progressive discipline already was in progress prior to any protected activity, temporal proximity alone cannot serve even as the minimal proof necessary to show prima facie causation. *See Porter v. Potter*, 366 F. App'x 195, 197 (2d Cir. 2010) ("Adverse employment actions that are part of an extensive period of progressive discipline that begins prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation sufficient to make out a prima facie case."); *see also McLee v. Chrysler Corp.*, 109 F.3d 130, 135-36 (2d Cir. 1997) (no causation inference possible where employee engaged in protected activity after aware of impending discipline). Although the Loudermill hearing and disciplinary process was completed on December 24, 2012 with the issuance of the ten-day suspension, there is no evidence rebutting Defendant's evidence that this was administration of progressive discipline following Plaintiff's five-day suspension and first unsatisfactory service rating. (*See* Harnick Aff. ¶35.)

Plaintiff argues that the ten-day suspension, despite being incrementally related to incidents which occurred before she filed her complaint, is evidence of retaliation because at that Loudermill hearing a DDS Human Resources employee approached Plaintiff's union representative and tried to "strike a deal" consisting of suspending Plaintiff's ten-day suspension and dropping her previous five-day suspension down to two days in exchange for Plaintiff

dropping her CHRO complaint. (Pl.'s Depo. at 92:24-95:16.) Plaintiff has not shown how this evidence would be admissible under Rule 408 since it appears to be an offer of settlement, and in any event no retaliatory animus can be inferred from these statements since Plaintiff had already twice been found to have neglected clients.

Thus, the only potential adverse actions on which Plaintiff's retaliation claim could be based are: the January 2013 report of the third incident of neglect and related investigation and discipline; the March 20, 2013 written warning for removing and disclosing confidential client information as part of her CHRO complaint; the second unsatisfactory performance evaluation; and her eventual termination issued October 31, 2013. The Court will address whether Plaintiff has presented sufficient evidence to infer a causal connection between her filing of the CHRO Complaint and these adverse employment actions.

Ms. Sheehan, who reported the third neglect incident in January 2013 did not do so for retaliatory purposes by Plaintiff's own account (Pl.'s Depo. at 119:11-12-:17) and was unaware of the CHRO complaint at the time she reported the incident as a mandated reporter. (Sheehan Aff., ¶11). Thus, the record is undisputed that the reporting of the incident itself was in no way retaliatory.

Although Plaintiff stated her belief that it was "possible" the investigator for the third incident, Jane Laudati, retaliated against her for filing her CHRO Complaint (Pl.'s Tr. at 125:2-127:22), she offers no evidence to rebut Ms. Laudati's averment that she was not aware of the CHRO Complaint at the time she conducted the investigation (Ex. 7 (Laudatti Aff.) to Def.'s Mot for Summary Judgment ¶ 10).

Finally Plaintiff suggests that because the associated Loudermill hearing took place April 5, 2013, approximately four days after Plaintiff filed an amendment to her CHRO Complaint,

Defendant's disciplinary decision at that hearing was retaliation for protected activity. (Pl.'s Opp'n at 27-28.) Plaintiff points to no evidence that Defendant was aware that she had amended her Complaint at that time. Moreover, as with the discipline for the second incident, neglect had already been substantiated prior to Plaintiff amending her Complaint and Plaintiff presents no evidence rebutting Defendant's evidence that the suspension was standard practice in accordance with progressive discipline. (*See* Harnick Aff. ¶ 44 and attached Exhibit O.)

With regard to the March 2013 written warning for disclosing confidential information, Plaintiff has not offered any evidence that it had any relationship to her in protected activity. The undisputed record shows Defendant has clear policy and work rules regarding the confidentiality of client records, of which Plaintiff was on notice. (*See* Exs. Q, R and S to Harnick Aff.; Pl.'s Depo. at 160:15-21.) Ms. Harnick, who issued the warning, was never claimed by Plaintiff to have had any retaliatory motive and no rational jury could find that Plaintiff's protected activity was a but-for cause of the written warning.

Finally, much like the other adverse actions, Plaintiff offers no evidence from which it can be inferred that either the second unsatisfactory evaluation or Plaintiff's eventual termination were linked to her filing her CHRO Complaint. Rather, there exists a record of three incidents of neglect which were substantiated by three different independent investigators and after each of which progressive discipline was imposed, all in accordance with Defendant's standard procedures. Specifically, Plaintiff's unsatisfactory service rating was based "in part" on the ten and fifteen-day suspensions she received for client neglect.[17] (Ex. V to Harnick Aff.) Additionally, all unsatisfactory

---

[17] The service rating also notes the written warning for removing confidential materials and that Plaintiff "must be more cooperative when working within the Team setting, comply with the

ratings are reviewed by Human Resources, (*see* Harnick Aff. ¶ 54) and Plaintiff makes no allegation that anyone at Human Resources acted with retaliatory motivation. Furthermore, Plaintiff's termination resulted from her two consecutive unsatisfactory performance evaluations, which under State Personnel Regulation 5-240-1a(c)(5), provides just cause for dismissal. (*Id.* ¶ 55.)

Ultimately, Plaintiff fails to identify any similarly situated employees who were treated differently than she, or any other direct or circumstantial evidence that any of the adverse employment actions occurred as a result of Plaintiff filing her CHRO Complaint. Accordingly, her Retaliation claim cannot survive summary judgment and must be dismissed.

### B. Hostile Work Environment

An employee may suffer discriminatory treatment in violation of Title VII if he or she is required to work in a hostile or abusive environment. *See e.g., Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) To prevail on this theory, a plaintiff must prove (a) that [s]he subjectively perceived the environment to be abusive; (b) that [her] working environment was "objectively hostile" and (c) that a specific basis exists for imputing the harassing conduct to the employer. *Howley v. Town of Stratford*, 217 F.3d 141, 153–54 (2d Cir. 2000).

An objectively hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). Whether an environment is "hostile" or "abusive" depends on the totality of circumstances. *Id.* at 23. Conduct that is "merely offensive," and "not severe or

---

consumer procedures/guidelines and DDS Work Rules as written and improve her dependability." (Ex. V to Harnick Aff.)

pervasive enough to create an objectively hostile or abusive work environment [meaning] an environment that a reasonable person would find hostile or abusive [ ] is beyond Title VII's purview." *Id.* Relevant considerations for assessing a hostile work environment claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23 (cited in *Pucino v. Verizon Wireless Communications, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)). "[I]t is axiomatic that to establish a race . . . based hostile work environment under Title VII, the plaintiff must demonstrate that the conduct occurred because of her race." *Mattison v. Potter*, 515 F. Supp. 2d 356, 372–73 (W.D.N.Y. 2007) (citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

"Facially neutral incidents may be included in the totality of the circumstances that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on" the protected characteristic at issue. *See Alfano v. Costello*, 294 F.3d 365, 378 (2002) (internal quotation marks omitted). "Incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination – for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." *Id.* at 375; *see also Howley*, 217 F.3d at 155-56 (concluding that a reasonable fact-finder could infer that facially sex-neutral incidents were based on gender-animus where the perpetrator had made prior sexually derogatory comments). Where a plaintiff relies on facially neutral incidents, "he must offer some additional evidence from which a reasonable jury could infer that these acts were, in fact, discriminatory." *Khan v. HIP Centralized Lab. Servs., Inc.*, No. CIV.A. CV03-2411(DGT), 2007 WL 1011325, at *5 (E.D.N.Y. Mar. 30, 2007); *see also Pronin v. Raffi Custom Photo Lab, Inc.*, 383 F. Supp. 2d 682, 634 (S.D.N.Y. 2005) (rejecting age-based hostile work environment claim

where comments at issue did not reference age and plaintiff offered no evidence, other than his own speculation, that the comments were motivated by his age).

Plaintiff claims as evidence of her hostile work environment the same incidents which formed the basis for her retaliation claim (including all three incidents of neglect), in addition to allegations of excessive monitoring based on Ms. Alvarez's alleged direction to another employee to have his staff watch her.[18] Plaintiff contends that the excessive scrutiny was "part of a broader campaign of harassment and retaliation, which included, among other things, disparate treatment, unequal punishment/suspensions," all of which together may be considered in determining whether Plaintiff was subject to a hostile work environment due to her race.

Plaintiff's hostile work environment claim fails on two fronts: she has not presented evidence that Defendant's actions were taken because of her race and/or color, nor has she shown these alleged incidents to be sufficiently severe or pervasive to rise to the level of creating a hostile work environment.

### i. There is no Evidence the Incidents Occurred Because of Plaintiff's Race and/or Color

Plaintiff testified that when she was transferred pending the neglect investigation Ms. Alvarez told her supervisor in that Unit, Jose Ayala, to have his staff watch her (Pl.'s Depo. at 106:12-107:25), which she maintains subjected her to excessive monitoring by her supervisors. [19]

---

[18] Just as with her retaliation claim, Plaintiff offers no argument or evidence of how the March 20 letter of warning for releasing confidential client information or the memorandum from Michelle Crapo regarding signing in-service sheets with question marks were in any way related to Plaintiff's race, even when viewed in conjunction with Plaintiff's other allegations.

[19] There is no evidence that any of the transfers were in any way due to Plaintiff's race and/or color but rather that it was standard practice at the Ella Grasso Center to transfer a staff member under investigation for client neglect to another unit. (Def.'s LR 56 ¶ 16.) Plaintiff could

*See Scafidi v. Baldwin Union Free School Dist.*, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003) ("To qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences.")).) However, Plaintiff offers no evidence beyond her assertion that Mr. Ayala told her of Ms. Alvarez's statement.[20] Moreover, she testified that she thought Ms. Alvarez made this request because of Plaintiff's race and/or color "because [she] just [did]," without identifying any facts supporting that speculative assertion. (Pl.'s Depo. at 108:3-15.) Finally, Plaintiff admits that no one actually did watch her. (*Id.* at 109:7-13.) Thus, no rational jury could conclude that Plaintiff was actually subject to any "excessive scrutiny."

In addition, Plaintiff argues that the three incidents of neglect support her claim of hostile work environment because they are evidence of disparate treatment. However, Plaintiff once again offers no evidence to support her conclusion that any of the incidents occurred because of her protected status. Defendant followed the same procedure with respect to each of the three incidents of neglect, including conducting an investigation after the incident was reported and holding a Loudermill hearing to determine the appropriate discipline. There were two different individuals who reported the incidents, Ms. Sheehan (reported first and third) and Mr. Dyer (reported second), and three different individuals who performed the subsequent investigations, Cynthia Stevenson, Joe Innamorato, and Jane Laudati. Counsel for Plaintiff affirmed at oral argument that

---

not provide any examples of non-black employees who were not transferred during an investigation. (Pl.'s Depo. at 78:5-79:13.)

[20] It is Plaintiff's burden to put forth evidence creating a material dispute of fact. Plaintiff offers no sworn statement of Mr. Ayala nor presents any other evidence that Ms. Alvarez directed him to watch Plaintiff. This is insufficient to create a dispute of fact requiring trial.

Plaintiff was not alleging discriminatory animus on the part of any of these individuals.[21] At her deposition she was unable to provide any examples of similarly situated Hispanic or non-black employees who were treated differently during neglect investigations (Pl.'s Depo. at 70:20-72:5) or any Hispanic employees who were treated better or differently than she was (*id.* at 56:22-58:6) as support for her claim of being targeted because of her race.

Similarly Plaintiff's unsatisfactory evaluation issued September 20, 2012 (Ex. C to Pl.'s Opp'n), the written warning issued to her for removing confidential information about a client, and the memorandum from Michele Crapo regarding signing the in-service sheets cannot constitute evidence of a hostile work environment absent any evidence that these incidents were related to her race and/or color to rebut the evidence that they were in response to Plaintiff's misconduct. In fact, Plaintiff identifies only one employee, Ms. Alvarez, who she claims had any discriminatory animus towards her, but offers no evidence supporting this contention aside from her own speculation and offers no evidence that Ms. Alvarez (or any other of Defendant's employees) ever made any racially discriminatory comment towards or about Plaintiff.

Because all of these incidents are facially neutral and Plaintiff fails to point to any overt discrimination, she has shown no genuine issue of material fact requiring trial on her hostile work environment claim.

### ii. *The Incidents Were not Sufficiently Severe or Pervasive*

Further, Plaintiff's proffered evidence falls short of the requisite severity or pervasiveness needed to support a hostile work environment claim, *see Smith v. New Venture Gear, Inc.*, 319

---

[21] Plaintiff testified at her deposition that she "just think[s]" her race played a role in Stevenson's investigation, once again without providing any additional factual support for this allegation. (Pl.'s Depo. at 71:21-25.)

Fed. Appx. 52, 56 (2d Cir. 2009), namely that the work place was "permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of [her] employment." *Harris*, 510 U.S. at 21.

Such circumstances requiring trial were found in *Howley v. Town of Stratford*, in which the plaintiff woman firefighter was subjected to a sexually explicit and degrading barrage of insults, delivered in front of her subordinates by a firefighter who also resisted orders from her and spread rumors questioning her competence. 217 F.3d 141, 148, 154–55 (2d Cir. 2000). The Second Circuit concluded that a rational juror could view such a tirade as humiliating and resulting in an intolerable alteration of the plaintiff's working conditions, based on the nature of the firefighters' occupation requiring unquestioning execution of line-of-command orders in emergency situations, and the negative effect of gender-based skepticism as to the competence of a commanding officer's ability to lead in the life-threatening circumstances faced by firefighters. *Id.* at 154. Similarly, in *Levitant v. City of New York Human Resources Administration,* the district court concluded that there was a genuine issue of fact precluding summary judgment on whether the plaintiff was subjected to a hostile work environment based on his race and national origin where the plaintiff presented evidence that supervisors disparaged his national origin, mocked his Russian accent, instructed him not to conduct telephone calls in his native Russian, and monitored him excessively. 625 F. Supp. 2d 85, 97-99 (E.D.N.Y. 2008).

By contrast, Plaintiff here has presented no evidence that these incidents taken together could be found to be of such severity and character as to subvert her ability to function in the workplace. There is no allegation that any of Plaintiff's supervisors ever directly referenced her race and/or color nor any evidence of disparaging statements or other inappropriate conduct directed towards Plaintiff because of her race and/or color. Thus, Plaintiff has not proffered

evidence of a hostile work environment. Accordingly, for this reason as well, Plaintiff's hostile work environment claim must be dismissed.

## III.     Conclusion

For the foregoing reasons Defendant's Motion for Summary Judgment is GRANTED. The Clerk is requested to close this case.

IT IS SO ORDERED.

/s/

_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of September 2017.